1

Chris M. Mason – 019891
cmason@jsslaw.com

2

**JENNINGS, STROUSS & SALMON, P.L.C.**
A Professional Limited Liability Company
One East Washington Street, Suite 1900

3

Phoenix, AZ 85004-2554
Telephone: (602) 262-5911

4

5

Michael L. Schwartz – 028365
Schwartz@schwartzlawfirmaz.com

6

**MICHAEL L. SCHWARTZ, PLLC**
7702 East Doubletree Ranch Road, Suite 300
Scottsdale, AZ 85258

7

Telephone: (480) 902-3055

8

*Attorneys for Defendants/Counterclaimants*

9

**IN THE UNITED STATES DISTRICT COURT**

10

**FOR THE DISTRICT OF ARIZONA**

11

JOANNE ZUNIGA, an individual, and
DAVID M. REAVES, Chapter 7

No. CV-15-1978-PHX-DKD

12

Bankruptcy Trustee,

13

Plaintiffs,

**DEFENDANTS'/
COUNTERCLAIMANTS'
MOTION FOR SUMMARY
JUDGMENT**

14

vs.

15

FIESTA PEDIATRIC THERAPY,
INC., an Arizona corporation; BETH

16

WILLIAMSON, an individual, and
RANDY WILLIAMSON, her husband,

17

Defendants.

18

19

FIESTA PEDIATRIC THERAPY,
INC., an Arizona corporation; BETH
WILLIAMSON, an individual, and

20

RANDY WILLIAMSON, her husband,

21

Counterclaimants,

22

vs.

23

JOANNE ZUNIGA, an individual, and
David Mr. Reaves, Chapter 7

24

Bankruptcy Trustee,

25

Counterdefendants.

26

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants /

27

Counterclaimants request the Court to enter summary judgment in their favor.

28

Plaintiff's claim under the Fair Labor Standards Act ("FLSA") fails as a matter of

law because Plaintiff was properly compensated commensurate with the Fluctuating Work Week Method ("FWW Method") of compensation.   As for Defendants / Counterclaimants affirmative claims, summary judgment should be entered in their favor given that Plaintiff has admitted under oath at deposition that she pilfered company records, including accessing Fiesta computer systems, and patient files. This Motion is supported by the following Memorandum of Points and Authorities and the Separate Statement of Facts ("SOF") submitted contemporaneously herewith.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   FACTUAL BACKGROUND

Fiesta provides specialized therapeutic services for disabled children with any of a variety of conditions, including autism, downs syndrome, and cerebral palsy, to name just a few.  [SOF ¶ 1.]  It was started nearly 30 years ago.  [SOF ¶ 1.]  It provides a fun and innovative environment catering to the therapeutic needs of children, many of whom are indigent and receive Fiesta's therapy services not available elsewhere through a variety of social service programs.  [SOF ¶ 1.]

The Plaintiff, Ms. Zuniga, began working for Fiesta in August of 2009.  [SOF ¶ 27.]  In 2011, she was made a salaried employee and her pay rate was increased, as implemented by her sister, Maria Singh, who managed the Fiesta operations.  [SOF ¶¶ 34, 42.]   Beginning at that time, Fiesta paid Ms. Zuniga an overtime rate equivalent to her base FLSA hourly rate.  [SOF ¶ 34.]  She was paid for all of her hours worked, including overtime hours.  [SOF ¶ 34.]  All of her overtime hours were compensated at the base rate of between $18.79 and $19 per hour during the relevant time period, which reflected gradual pay rate increases between 2011 and her final date of employment in December 2014.  [SOF ¶¶ 34, 42.]  Ms. Zuniga was paid at this overtime rate (equivalent to her base rate) for over three consecutive years. [SOF ¶ 42.]

In December of 2014, Ms. Zuniga decided to surreptitiously copy and take Fiesta patient records, including treatment and billing records.  [SOF ¶¶ 103-111.]

1  Her purpose was to use the records to support allegations of purported billing

2  irregularities to state agencies.  [SOF ¶ 104.]  The patient records included records

3  copied from hard files, and records that she printed from Fiesta's computer systems.

4  [SOF ¶ 107.]

5      Ms. Zuniga was terminated that month.  [SOF ¶¶ 98, 101.]  She first filed a

6  legal claim against Fiesta roughly eight months after her separation from Fiesta in

7  December 2014.  [SOF ¶ 117.]  Although her claim purports to seek recovery for

8  years preceding the filing of her Complaint (which she filed August 12, 2015), she

9  had previously filed bankruptcy on October 15, 2014.  She had not disclosed her

10  claimed right to unpaid overtime in her bankruptcy filings.  [SOF ¶¶ 112-117.]

11  Indeed, she first formally asserted a claim for the unpaid overtime just days after her

12  bankruptcy was discharged.  [SOF ¶¶ 114, 115.]  Her attorneys only first brought the

13  claim to the attention of the bankruptcy Trustee after undersigned counsel discovered

14  the bankruptcy and notified Ms. Zuniga's counsel of the failure to disclose the claim.

15  [SOF ¶ 122.]

16  **II.   LEGAL DISCUSSION**

17      **A.   Summary Judgment Standard**

18      Summary judgment should be granted where "there is no genuine issue as to

19  any material fact and the moving party is entitled to judgment as a matter of law."

20  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548,

21  91 L. Ed. 2d 265 (1986); *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150,

22  1155 (9th Cir. 2015).  "Disputes over irrelevant or unnecessary facts will not preclude

23  a grant of summary judgment."  *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors*

24  *Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).

25      **B.   Ms. Zuniga's FLSA Claim Should be Dismissed Because she was**
       **Properly Paid Under the Fluctuating Workweek Method of Pay.**

26

27      Despite some misperception, the FLSA does not create a single, static method

28  of pay.  In fact, there are countless pay methodologies employers may use in full

1  compliance with the FLSA, including salaries, piece-rates, commissions, Belo plans,

2  and many others.  According to data compiled by the United States Department of

3  Labor Statistics, only 58.5 percent of American workers are even paid by the hour,

4  meaning that the remaining 41.5 percent are compensated through alternative means.[1]

5  (Exhibit A hereto.)  The FLSA merely creates a floor below which an employer may

6  not drop, not a rigid pay formula mandated for all employees.

7        One permissible pay methodology is the FWW Method.  The FWW Method is

8  permissible when: (1) the employee's work hours fluctuate from week to week; (2)

9  the employee receives a fixed salary regardless of hours worked; (3) the fixed salary

10  is sufficient to provide compensation every week at a regular rate that was at least

11  equal to the minimum wage; (4) the employer and the employee share a "clear and

12  mutual understanding" that the employer would pay the fixed salary regardless of

13  hours worked; and (5) the employee receives overtime compensation at no less than

14  one-half the rate of pay for hours worked in excess of forty in a workweek.  *See*

15  *Flood v. New Hanover County*, 125 F.3d 249, 252 (4th Cir. 1997); *Overnight Motor*

16  *Transp. Co. v. Missel*, 316 U.S. 572 (1942) (first approving the fluctuating workweek

17  methodology of overtime pay).

18        "[The FWW Method] is not an 'exception' to the FLSA.  It merely provides

19  an alternative means by which an employer can determine its employees' regular and

20  overtime rate of pay."  *Flood v. New Hanover County*, 125 F.3d 249, 252 (4th Cir.

21  1997); *accord Samson v. Apollo Res., Inc.*, 242 F.3d 629, 636 (5th Cir. 2001).  Thus,

22  "the employee bears the burden of proving that the employer failed to properly

23  administer the FWW Method" because "generally, a plaintiff suing under the FLSA

24  carries the burden of proving all elements of his or her claim."  *Samson v. Apollo*

25

26      [1] This data is published annually every April.  The most recently-available

27  data is data for calendar year 2015.  The data for calendar year 2016 is not yet
    available as of the filing of this Motion.  Nonetheless, the changes in percentages are

28  minor when measured from one year to the next."

*Resources, Inc.*, 242 F.3d 629, 636 (5th Cir. 2001); *accord Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1311 (11th Cir. 2013) ("[T]he fluctuating workweek method is not an affirmative defense; rather, the employee bears the burden of proving that the employer failed to properly administer [it]."  (internal quotations omitted)); *Caraballo v. City of Chicago*, 969 F. Supp. 2d 1008, 1020 (N.D. Ill. 2013) ("An employee bears the burden of proving that the employer failed to administer the FWW method correctly.").

Here, Fiesta properly paid Ms. Zuniga consistent with the FWW Method.  Her work hours fluctuated dramatically from week to week.  [SOF ¶ 97.]  She received a fixed salary regardless of hours worked.  [SOF ¶ 55.]  Her fixed salary compensated her more than the minimum wage for hours worked.  [SOF ¶ 55.]  She and Fiesta had a clear and mutual understanding that she would always get her base salary regardless of hours worked.  [SOF ¶¶ 34, 35, 42-52.]  And she received overtime compensation at no less than one-half the rate of pay for her hours worked in excess of forty in a workweek.  [SOF ¶ 42.]  Ms. Zuniga's various arguments, as addressed below, cannot overcome these simple facts.

1)   **Ms. Zuniga received a fixed salary despite her *post-hoc* attempts to label her pay as "hourly."**

Ms. Zuniga spars with reality and common sense in arguing that she was an hourly employee, despite her prior candid written acknowledgements and company records proving she was salaried.  [SOF ¶¶ 45-52.]  But her argument is misdirection. The requirement that an employee receive a fixed salary does not turn on labels or euphemisms.  It merely demands that an employee receive a set minimum amount of pay from week to week sufficient to satisfy minimum wage requirements regardless of actual hours worked.   This is all that is meant and intended by the salary requirement.

Courts evaluating whether an employee is paid a "salary" in compliance with FLSA salary requirements have recognized that accounting systems and labels

1   notwithstanding, the question turns on whether an employer made reductions from

2   minimum base pay for work absences.  For instance, in *McGuire v. City of Portland*,

3   the Ninth Circuit recognized that an employer's use of an hourly accounting system

4   and the employees' claim that they were hourly was beside the point.  The Ninth

5   Circuit ruled that the employer met the salary requirement because the employees'

6   minimum base pay was not ordinarily reduced for absences from work.  159 F.3d

7   460, 464 (9th Cir. 1998).  Numerous other courts have recognized the same principle.

8   *See*, *e.g.*, *B.N. Spradling v. City of Tulsa*, 95 F.3d 1492, 1500 (10th Cir. 1996) (ruling

9   that the fact that pay stubs included the number of hours did not preclude a finding

10   that the employees were paid on a salary basis); *Wight v. Aargo Sec. Servs., Inc.*,

11   2001 WL 91705 at *7 (S.D.N.Y. 2001) ("The label an employer or a time record

12   furnishes an employee for internal purposes is not determinative of the employee's

13   status under the FLSA.  The employer's subjective intent is not the litmus test.")

14   ("Thus, the pivotal issue is generally whether or not an employee's salary is subject

15   to reduction for absences of less than a day."); *Palazzolo-Robinson v. Sharis Mgmt.*

16   *Corp.*, 68 F. Supp. 2d 1186, 1192 (W.D. Wash. 1999) ("[A] payroll accounting

17   system which calculates an exempt employees [sic] pay on an hourly basis does not

18   indicate that the employee was not salaried and, thus, is not subject to the FLSA's

19   minimum wage or overtime requirements."); *Cf. Cash v. Conn Appliances, Inc.*, 2 F.

20   Supp. 2d 884, 904 (E.D. Tex. 1997) (holding that for purposes of the FWW method

21   the notion of "salary" means "a fixed sum paid at regular intervals of time that serves

22   as the foundation of employee non-overtime pay.").

23      Ms. Zuniga's base pay was never reduced for absences or any other reason.

24   [SOF ¶ 55.]  She always received pay for a minimum of 86.67 hours, even during

25   entire weeks while she was out.  [SOF ¶ 55.]  She has not met, and cannot meet, her

26   burden of proving improper deductions.  She was therefore paid on a salary basis.

27

28

**2)** **Ms. Zuniga's admission that she chose to keep working under the pay arrangement to get as many overtime hours as possible satisfies the "clear and mutual understanding" element.**

No signed consent or other affirmative acknowledgement by the employee is required to apply the FWW Rate.  *See*, *e.g.*, 29 C.F.R. § 778.114 ("Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek . . ."); *Samson*, 242 F.3d at 637; *Griffin v. Wake County*, 142 F.3d 712, 717 (4th Cir. 1998) (providing that use of the FWW Rate does not require an "employer [to] hold an employee's hand and specifically tell him or her precisely how the payroll system works").  "An agreement or understanding need not be in writing in order to validate the application of the fluctuating workweek method of paying overtime.  Where an employee continues to work and accept payment of a salary for all hours of work, her acceptance of payment of the salary will validate the fluctuating workweek method of compensation as her employment."  DOL Wage & Hour Division Opinion Letter – FLSA-772 (Feb. 26, 1973).

Numerous authorities affirm that an employee who continues to work fluctuating workweeks and receives a fixed salary regardless of hours worked has inherently expressed knowledge and acceptance of the relationship.  *See, e.g., id. Griffin*, 142 F.3d at 717; *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 39 (1st Cir. 1999); *Mayhew v. Wells*, 125 F.3d 216, 219 (4th Cir. 1997); *Zoltek v. Safelite Glass Corp.*, 884 F. Supp. 283 (N.D. Ill. 1995).  For purposes of the FWW, all that is needed is for Ms. Zuniga to be aware that she would get her full base pay despite actual hours worked.  *See id.*  She clearly was.

Ms. Zuniga attempts to change the dialogue by arguing that she did not agree to the arrangement and did not have a full understanding of how a fluctuating workweek system works.  But again, that is not the test.  Courts have rejected similar attempts to change the meaning of the "clear and mutual understanding" element.

*See Samson v. Apollo Res., Inc.*, 242 F.3d 629, 637 (5th Cir. 2001) ("Section 778.114 is specific as to what an employee must understand before the FWW method may be used . . . . We decline to expand the "clear understanding requirement of section 778.114 to include the details cited by the Plaintiffs."); *Stein v. Guardsmark LLC*, 2013 WL 3809463 (S.D.N.Y. 2013) ("This rule [Section 778.114] does not require an understanding of how the FWW method works or that overtime will be paid according to this method.  Thus, many courts have deemed it irrelevant that an employee did not actually understand the full details of how her employer's FWW program operated."); *Valerio v. Putnam Assocs., Inc.*, 173 F.3d 35, 39 (1st Cir. 1999); *Zoltek v. Safelite Glass Corp.*, 884 F. Supp. 283 (N.D. Ill. 1995).

### 3) <u>Hours need not fluctuate below 40 for the FWW to apply, but, in any event, Ms. Zuniga's did.</u>

It appears that every circuit court addressing the issue has ruled that for purposes of the FWW Method an employee's hours need not fluctuate below 40 in a workweek.  *See Urnikis-Negro v. American Fam. Prop. Servs.*, 616 F.3d 665, 683-84 (7th Cir. 2010); *Condo v. Sysco Corp.*, 1 F.3d 599, 605 (7th Cir. 1993); *Aiken v. County of Hampton*, 1998 WL 957458 at *3 (4th Cir. 1998); *Yadav v. Colemen Oldsmobile, Inc.*, 538 F.2d 1206, 1207-08 (5th Cir. 1976).[2]   Although not every district court has followed suit, many have.  *Hasan v. GPM Investments, LLC*, 896 F. Supp. 2d 145, 150 (D. Conn. 2012); *Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725, 734 (S.D. Ohio 2006); *Newsom v. NPC Inter.*, 2003 WL 23849758 at *4 (W.D. Tenn. 2003).   There is no requirement expressed anywhere in the rule adopted by the Department of Labor mandating fluctuation below 40 hours in a workweek.  29 C.F.R. § 778.114.  Certainly the Department of Labor knows how to

---

[2] While the Ninth Circuit has not expressly ruled on the issue, it has approved the use of the FWW Method to compute damages for employees who never worked less than 40 hours in a workweek and generally worked dramatically more.  *See Gen. Elec. Co. v. Porter*, 208 F.2d 805, 812-13 (9th Cir. 1953).

express a below-40 requirement in its rulemaking and chose not to do so for the FWW Method – we can look to its rules for application of Belo Plans to see this in action.  *Compare* 29 C.F.R. § 778.406 (requiring fluctuation below 40 to apply *Belo* plans) *with* 29 C.F.R. § 778.114 (not requiring fluctuation below 40 to apply FWW Method).

Regardless, Ms. Zuniga's hours actually fluctuated below 40 at times.  [SOF ¶¶ 53-68.]  Consequently, the FWW Method has been properly applied.

### 4) **The charging of Ms. Zuniga's PTO bank does not defeat the FWW Method as a matter of law and fact.**

Countless authorities recognize that the docking of an employee's PTO or vacation bank does not defeat the application of the FWW Method.  This is because the FLSA governs employee pay, not the amount of PTO time they accumulate.  *See*, *e.g.*, *Griffin v. Wake County*, 142 F.3d 712, 717-18 (4th Cir. 1998) ("[S]ection 778.114 does not mention leave or vacation at all – it only governs the *pay* that employees receive. . . . [S]uch deductions from leave do not constitute a violation of Section 778.114."); *Foucher v. Kraft Foods Global, Inc.*, 2009 WL 4350251 at n.3 (E.D. Mich. 2009) ("Kraft's method of deducting from an employee's accrued leave bank when an employee misses a day of work does not violate the FWW method and was, and has been, permissible under the FWW method for at least 15 years."); *Teblum v. Eckerd Corp. of Fla, Inc.*, 2006 WL 288932 at *8 (M.D. Fla. 2006) ("This Court agrees with Defendant that an employer does not run afoul of 29 C.F.R. § 778.114 simply by making deductions from an FWW employee's nonproductive time bank ['i.e. holiday, sick, or vacation'] for hours an employee does not actually work so long as the employee receives the same weekly base salary.); *Aiken v. County of Hampton*, 977 F. Supp. 390, 397 (D.S.C. 1997) ("A reduction in paid leave time does not affect an employee's status as a salaried employee" for purposes of the FWW method of pay).  The Department of Labor is in full agreement with this principle.  *See* Opinion Letter of the Wage and Hour Administrator, 95-99 CCH-WH,

Department of Labor, 1995 WL 1032466 (Feb. 27, 1995) (ruling that the requirements of 778.114 are met when an employee receives his or her full salary regardless of deductions from vacation or sick leave banks).

This employment law principle correlates with a similar principle for purposes of the salary basis test for the white collar exemptions under the FLSA. The Department of Labor and the courts, including the Ninth Circuit, have long held that docking of an employees' PTO or vacation bank does not defeat the salary basis test. *See*, *e.g.*, 29 C.F.R. § 541.602(b)(2); *Barner v. City of Novato*, 17 F.3d 1256, 1261-62 (9th Cir. 1994) (holding that the use of the words "amount" and "compensation" in DOL regulations refers to "cash" or "salary" not personal or vacation time for purposes of defeating salary basis test when there are deductions from accrued vacation pools).

Even were we to ignore this well-established, well-reasoned, line of authorities, Ms. Zuniga still had and used an unending amount of PTO, regardless of what she did or did not have in her PTO bank. [SOF ¶¶ 53-68.] As the records reflect, Ms. Zuniga exceeded her two-week annual PTO allotment on a regular basis without consequence. [SOF ¶¶ 53-68.] Indeed, in one particular year, she took over three weeks of time away from work for addiction treatment. [SOF ¶ 62.]

### C.   Ms. Zuniga's FLSA Claim is Limited by the Applicable Limitations Period.

To the extent not dismissed on summary judgment, Ms. Zuniga's FLSA claim is limited to a period of two years preceding the filing of her Complaint. 29 U.S.C. § 255(a). She first filed her Complaint on August 12, 2015. Two years preceding that date is August 12, 2013. Claims for any alleged underpayments before August 12, 2013 are time-barred and, thus, summary judgment should be granted to Defendants as to those elements of her claim.[3]

---

[3] Ms. Zuniga's Complaint seeks recovery of alleged underpayments dating more than three years preceding the filing of her Complaint.

**D.** **Ms. Zuniga's FLSA Claim is Estopped Because she did not Disclose it in her Bankruptcy Filings.**

Ms. Zuniga had a duty to disclose her contingent FLSA claims for alleged unpaid overtime with her bankruptcy filings.  [SOF ¶¶ 116, 126.]  She not only failed to disclose them, she appeared to delay formal assertion of the claims until just after notice of discharge was issued.  [SOF ¶¶ 112-127.]  Even after filing her FLSA claim in court, she did not disclose it to the bankruptcy court or the Trustee of her own volition.  Her counsel did so only after undersigned counsel raised it as an issue.  Under the circumstances, Ms. Zuniga's FLSA claims, to the extent they pre-date the filing of her bankruptcy, should be estopped.  *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783-84 (9th Cir. 2001).

**E.** **Ms. Zuniga Admits to Stealing Records from Fiesta and, Thus, Summary Judgment Should be Entered in Favor of Fiesta for its Counterclaims Related to the Thefts.**

Ms. Zuniga admits to stealing hard copy and electronic patient records from Fiesta in December of 2014, warranting an entry of summary judgment in Fiesta's favor on liability for claims relating to the thefts.   [SOF ¶¶ 103-109, 110, 111.]  Fiesta has brought three claims against Ms. Zuniga related to the thefts – namely for breach of the duty of loyalty, misappropriation (conversion), and violation of the Computer Fraud and Abuse Act – and summary judgment is appropriate as to all three claims.

**1)** **Ms. Zuniga breached her duty of loyalty.**

First, Ms. Zuniga breached her duty of loyalty to Fiesta.  "[I]n Arizona, an employee . . . owes his or her employer . . . a fiduciary duty," including a duty of loyalty.  *McCallister Co. v. Kastella*, 170 Ariz. 455, 457-58, 825 P.2d 980, 982-83 (App. 1992); *accord Security Title Agency, Inc. v. Pope*, 219 Ariz. 480, 492, 200 P.3d 977, 989 (App. 2008).  The Restatement of Agency, which Arizona follows, recognizes that "an agent is subject to a duty to his principal to act solely for the

benefit of the principal in all matters connected with his agency."[4]   Restatement (Third) of Agency § 8.01 (2006).  That duty includes several obligations, including "a duty not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship."  Restatement (Third) of Agency § 8.03 (2006).  An agent is further bound "not to use property of the principal for the agent's own purposes or those of a third party."  *Id.* at § 8.05.  "Even if the [employee] divided loyalty does not result in demonstrable harm to the principal, the [employee] has breached the agent's duty of undivided loyalty."  *Id.* at § 8.03, cmt. b.

Ms. Zuniga violated her duty of loyalty to Fiesta by taking its patient records. [SOF ¶¶ 74-75, 103-111.]  The records that Ms. Zuniga took were, in fact, HIPAA-protected medical records.  [SOF ¶¶ 103-111.]  Under HIPAA, a health care provider (including Fiesta), must maintain the confidentiality of patient records.  Formal processes must be followed to take or transmit patient, and Ms. Zuniga's removal of those records put Fiesta at risk under HIPAA.  Indeed, "[w]rongful disclosure of individually identifiable health information by a person in a HIPAA covered entity is a crime, punishable by a fine of up to $50,000, a prison term of up to one year, or both."  *Patten v. State*, 273 Or. App. 476, 492 (Or. 2015).

### 2)   Ms. Zuniga misappropriated Fiesta patient records.

Second, Ms. Zuniga misappropriated Fiesta's patient records. Misappropriation, also known as "conversion," is the "'intentional exercise of dominion or control over chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'"  *Miller v. Hehlen*, 209 Ariz. 462, 472, 104 P.3d 193, 203 (App. 2005) (quoting Restatement (Second) of Torts § 222A(1)).  The intent required is

---

[4]   Arizona courts follow the Restatement of Agency for guidance when interpreting the application of employee common-law duties and responsibilities. *See*, *e.g.*, *Fidelity & Deposit Co. v. Bondwriter Southwest, Inc.*, 228 Ariz. 84, 90, 263 P.3d 633, 639 (App. 2011).

"'an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'"   *Id.*   An employer's right to exercise exclusive dominion and control over its records is protected from conversion. Restatement (Second) of Torts § 242.

In this matter, Ms. Zuniga intentionally and improperly copied Fiesta's patient records for her own purposes, taking the copies she improperly made off of Fiesta property.   This interfered with Fiesta's "exclusive" right to control those records. Courts in other jurisdictions have found that the improper taking or retention of patient medical records by a staff member constitutes an improper conversion of those records.   *Comprehensive Comm. Dev. Corp. v. Lehach*, 223 A.D.2d 399, 399 (1996) (finding that former physician-employee's retention of copies of 500 medical records constituted conversion).

### 3)   Ms. Zuniga violated the Computer Fraud and Abuse Act.

Third, Ms. Zuniga violated the Computer Fraud and Abuse Act.   Among other things, the CFAA prohibits individuals from "intentionally access[ing] a computer without authorization or exceed[ing] authorized access and thereby obtain[ing] . . . information from any protected computer."[5]   18 U.S.C. § 1030(a)(2)(C).   Any person may maintain a civil action under the CFAA if the improper access involves one of the five factors set forth in the five subclauses of subsection (c)(4)(A)(i).   18 U.S.C. § 1030(g).   For purposes of this Motion, we focus on subclause (II) which provides that the "offense caused . . . the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals."

As the facts in this matter demonstrate, Ms. Zuniga admittedly accessed Fiesta

---

[5] The term "protected computer" includes computers "used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). Fiesta's computers are used in "interstate commerce" as that term is used under established federal law.

computers and HIPAA-protected patient information kept on those computers, and printed copies of those materials.  [SOF ¶¶ 103-111.]  Her access was both without authorization and in excess of that authorization.   First, the particular HIPAA-protected patient records fell outside of the normal scope of the records to which she was normally entitled to have access.  [SOF ¶ 111.]  Her normal job duties, including administrative support and patient scheduling, did not necessitate access to patient treatment notes.   [SOF ¶ 111.]   Thus, she accessed those records without authorization.

Ms. Zuniga also exceeded her authorization because her purpose in accessing the records – to fuel her personal claims of purported billing irregularities – was not an authorized purpose.  [SOF ¶¶ 103-104.]  This application of the CFAA raises a split of legal authority that must be addressed.  The Ninth Circuit has previously ruled that an employee who accesses company systems with an improper purpose has not violated the CFAA.  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).  This is a matter of significant disagreement between the Circuits which will require Supreme Court decision and resolution.  *See*, *e.g.*, *United States v. John*, 597 F.3d 263, 272 (5th Cir. 2010); *United States v. Rodriguez*, 628 F.3d 1258, 1263 (11th Cir. 2010); *Int'l Airport Ctrs., LLC v. Citron*, 440 F.3d 418, 419-21 (7th Cir. 2006); *Guest-Tek Int. Enter., Inc. v. Pullen*, 665 F. Supp. 2d 42, 45-46 (D. Mass. 2009) (recognizing that the First Circuit takes the broader view, citing *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 582-84 (1st Cir. 2001)).  Undersigned counsel recognizes this Court's obligation to follow Ninth Circuit precedence on this matter, but raises it to preserve it for later appellate resolution.

## III.   CONCLUSION

For the foregoing reasons, Defendants/Counterclaimants request the entry of summary judgment in their favor.

1     RESPECTFULLY SUBMITTED this 7th day of March, 2017.

2                                    **JENNINGS, STROUSS & SALMON, P.L.C.**

3
                                     By */s/ Chris M. Mason*
4                                        Chris M. Mason
                                         One East Washington St., Suite 1900
5                                        Phoenix, AZ  85004-2554
                                         *Attorneys for Defendants/Counterclaimants*
6
                                     **MICHAEL L. SCHWARTZ, PLLC**
7

8                                    By */s/ Michael L. Schwartz*
                                         Michael L. Schwartz
9                                        7702 East Doubletree Ranch Road.
                                         Suite 300
10                                       Scottsdale, AZ  85258
                                         *Attorneys for Defendants/Counterclaimants*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

- Kraig J. Marton: kjm@jaburgwilk.com

- Jeffrey A. Silence: jxs@jaburgwilk.com

- Michael L. Schwartz: Schwartz@schwartzlawfirmaz.com

I further certify that on March 7, 2017, I put in the U.S. Mail a paper courtesy copy of the foregoing document and the Notice of Electronic Filing to the assigned Judge.

*/s/Kathrine A. Roberts*
Kathrine A. Roberts

# EXHIBIT A

A to Z Index | FAQs | About BLS | Contact Us        Subscribe to E-mail Updates   GO

Follow Us  ⌐ | What's New | Release Calendar | Blog
Search BLS.gov                               Q

Home    Subjects    Data Tools    **Publications**    Economic Releases    Students    Beta

HOME    ARCHIVE    ABOUT BLS REPORTS

April 2016                                                                        Report 1061

# Characteristics of minimum wage workers, 2015



In 2015, 78.2 million workers age 16 and older in the United States were paid at hourly rates, representing 58.5 percent of all wage and salary workers. Among those paid by the hour, 870,000 workers earned exactly the prevailing federal minimum wage of $7.25 per hour. About 1.7 million had wages below the federal minimum. Together, these 2.6 million workers with wages at or below the federal minimum made up 3.3 percent of all hourly paid workers.

The percentage of hourly paid workers earning the prevailing federal minimum wage or less declined from 3.9 percent in 2014 to 3.3 percent in 2015. This remains well below the percentage of 13.4 recorded in 1979, when data for hourly-paid were first collected on a regular basis. (See table 10.)

This report presents highlights and statistical tables describing workers who earned at or below the federal minimum wage in 2015. The data are obtained from the Current Population Survey (CPS), a national monthly survey of approximately 60,000 households conducted by the U.S. Census Bureau for the U.S. Bureau of Labor Statistics (BLS). Information on earnings is collected from one-fourth of the CPS sample each month.

The CPS does not include questions on whether workers are covered by the minimum wage provisions of the federal Fair Labor Standards Act (FLSA) or by individual state or local minimum wage laws. The estimates of workers paid at or below the federal minimum wage are based solely on the hourly wage they report, which does not include overtime pay, tips, or commissions. See the accompanying technical notes section for more information, including a description of the source of the data and an explanation of the concepts and definitions used in this report.

## Highlights

The following are highlights from the 2015 data:

***Age.*** Minimum wage workers tend to be young. Although workers under age 25 represented only about one-fifth of hourly paid workers, they made up about half of those paid the federal minimum wage or less. Among employed teenagers (ages 16 to 19) paid by the hour, about 11 percent earned the minimum wage or less, compared with about 2 percent of workers age 25 and older. (See tables 1 and 7.)

***Gender.*** Among workers who were paid hourly rates in 2015, about 4 percent of women and about 3 percent of men had wages at or below the prevailing federal minimum. (See table 1.)

***Race and Hispanic or Latino ethnicity.*** The major race and ethnicity groups had similar percentages of hourly workers paid wages at or below the federal minimum. About 3 percent of White, Asian, and Hispanic or Latino workers earned the federal minimum wage or less. Among Black workers, the percentage was about 4 percent. (See table 1.)

***Education.*** Among hourly paid workers age 16 and older, about 6 percent of those without a high school diploma earned the federal minimum wage or less, compared with about 3 percent of those who had a high school diploma (with no college), 3

percent of those with some college or an associate degree, and about 2 percent of college graduates. (See table 6.)

**Marital status.** Of those paid an hourly wage, never-married workers, who tend to be young, were more likely (5 percent) than married workers (2 percent) to earn the federal minimum wage or less. (See table 8.)

**Full- and part-time status.** About 7 percent of part-time workers (those who usually work fewer than 35 hours per week) were paid at or below the federal minimum wage, compared with about 2 percent of full-time workers. (See tables 1 and 9.)

**Occupation.** Among major occupational groups, the highest percentage of hourly paid workers earning at or below the federal minimum wage was in service occupations, at about 9 percent. Almost two-thirds of workers earning the minimum wage or less in 2015 were employed in service occupations, mostly in food preparation and serving related jobs. (See table 4.)

**Industry.** The industry with the highest percentage of workers earning hourly wages at or below the federal minimum wage was leisure and hospitality (15 percent). Nearly three-fifths of all workers paid at or below the federal minimum wage were employed in this industry, the vast majority in restaurants and other food services. For many of these workers, tips may supplement the hourly wages received. (See table 5.)

**State of residence.** The states with the highest percentages of hourly paid workers earning at or below the federal minimum wage were in the South: Alabama, Louisiana, Mississippi, and Virginia (all were about 6 percent). The states with the lowest percentages of hourly paid workers earning at or below the federal minimum wage were in the West: Alaska, California, Oregon, and Washington (all were about 1 percent). It should be noted that some states have laws establishing higher minimum wage rates than the federal minimum wage. (See tables 2 and 3.)

## Statistical Tables

[+] Table 1. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by selected characteristics, 2015 annual averages

[+] Table 2. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by census region and division, 2015 annual averages

[+] Table 3. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by state, 2015 annual averages

[+] Table 4. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by occupation, 2015 annual averages

[+] Table 5. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by industry, 2015 annual averages

[+] Table 6. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by educational attainment, 2015 annual averages

[+] Table 7. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by age and gender, 2015 annual averages

[+] Table 8. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by marital status, age, and gender, 2015 annual averages

[+] Table 9. Wage and salary workers paid hourly rates with earnings at or below the prevailing federal minimum wage, by usual hours worked per week on primary job, 2015 annual averages

[+] Table 10. Wage and salary workers paid hourly rates with earnings at or below prevailing federal minimum wage, by gender, 1979–2015 annual averages
(numbers in thousands)

## Technical Notes

The estimates in this report were obtained from the Current Population Survey (CPS), which provides information on the labor force, employment, and unemployment. The survey is conducted monthly for the U.S. Bureau of Labor Statistics (BLS) by the U.S. Census Bureau using a scientifically selected national sample of about 60,000 eligible households in all 50 states and the District of Columbia. The survey also provides data on earnings, which are based on one-fourth of the CPS monthly sample and are limited to wage and salary workers. All self-employed workers, both incorporated and unincorporated, are excluded from these earnings estimates.

Upon request, the information in this article will be made available to individuals who are sensory impaired. Voice telephone: (202) 691-5200. Federal Relay Service: 1-800-877-8339. This report is in the public domain and may be used without permission.

## Concepts and definitions

The principal definitions for the main concepts presented in this report are below.

*Wage and salary workers* are those age 16 and older who receive wages, salaries, commissions, tips, payments in kind, or piece rates on their sole or principal job. This group includes employees in both the private and public sectors. All self-employed workers are excluded whether or not their businesses are incorporated.

*Workers paid by the hour* are wage and salary workers who report that they are paid at an hourly rate on their job. Historically, workers paid an hourly wage have made up approximately three-fifths of all wage and salary workers. Estimates of workers paid by the hour include both full- and part-time workers unless otherwise specified.

*Hourly earnings* data are for wage and salary workers who are paid by the hour and refer to a person's sole or principal job. Hourly earnings for hourly paid workers do not include overtime pay, commissions, or tips received.

*Workers paid at or below the prevailing federal minimum wage* pertain only to workers who are paid hourly rates. Salaried workers and other nonhourly paid workers are excluded.

Regular collection of earnings data in the basic CPS began in 1979. The prevailing federal minimum wage for 1979 and later years is listed below:

| Federal minimum wage | Effective date |
|---|---|
| $2.90 | January 1, 1979 |
| $3.10 | January 1, 1980 |
| $3.35 | January 1, 1981 |
| $3.80 | April 1, 1990 |
| $4.25 | April 1, 1991 |
| $4.75 | October 1, 1996 |
| $5.15 | September 1, 1997 |
| $5.85 | July 24, 2007 |
| $6.55 | July 24, 2008 |
| $7.25 | July 24, 2009 |

Estimates of the annual average number of minimum wage workers for years when the minimum wage increased reflect both minimum wage levels in effect during the year. For example, data for 2007 reflect the number of workers at or below the federal minimum of $5.15 for January to July and $5.85 for August to December.

*Full-time workers* are defined as those who usually work 35 hours or more per week at their sole or principal job.

*Part-time workers* are defined as those who usually work fewer than 35 hours per week at their sole or principal job.

*Race* is determined by the household respondent in the survey process. In accordance with the Office of Management and Budget guidelines, White, Black or African American, Asian, American Indian or Alaska Native, and Native Hawaiian or Other Pacific Islander are terms used to describe a person's race. The latter two race groups and people who selected more than one race are included in totals but not separately identified in this report because the number of survey respondents is too small to develop estimates of sufficient quality.

*Hispanic or Latino ethnicity* refers to people who identified themselves in the survey process as being of Hispanic, Latino, or Spanish origin. People whose ethnicity is identified as Hispanic or Latino may be of any race.

## Interpreting minimum wage data

The CPS does not determine whether workers are covered by the minimum wage provisions of the federal Fair Labor Standards Act (FLSA) or by individual state or local minimum wage laws. The estimates of workers paid at or below the federal minimum wage are based solely on the hourly wage they report (which does not include overtime pay, tips, or commissions). Some respondents might round hourly earnings when answering survey questions. As a result, some workers might be reported as having hourly earnings above or below the federal minimum wage when, in fact, they earn the minimum wage.

Some workers reported as earning at or below the prevailing federal minimum wage may not, in fact, be covered by federal or state minimum wage laws because of exclusions and exemptions in the statutes. Thus, the presence of workers with hourly earnings below the federal minimum wage does not necessarily indicate violations of the FLSA or state statutes in cases where such standards apply.

Estimates of the number of minimum wage workers in this report pertain only to workers who are paid hourly rates. Salaried workers and other workers who are not paid by the hour are excluded, even though some have earnings that, if converted to hourly rates, would be at or below the federal minimum wage. Consequently, the estimates presented in this report likely understate the actual number of workers with hourly earnings at or below the minimum wage. BLS does not routinely estimate the hourly earnings of workers not paid by the hour because of data-quality concerns associated with constructing such an estimate.

A number of states have established minimum wage rates that exceed the federal level. (Information on state minimum wage laws is available at www.dol.gov/whd/minwage/america.htm.) Users should be cautious about comparing state estimates in this report because of differing statutory minimum wages. It also should be noted that the CPS sample is based on residence; workers report their earnings on their job, which may or may not be located in the same state in which they live. In addition, the degree of sampling error may be quite large for some state estimates.

## Reliability

Statistics based on the CPS are subject to both sampling and nonsampling error. When a sample, rather than the entire population, is surveyed, there is a chance that the sample estimates may differ from the true population values they represent. Sampling error is the component of this difference that occurs because samples differ by chance, and its variability is measured by the standard error of the estimate. There is about a 90-percent chance, or level of confidence, that an estimate based on a sample will differ by no more than 1.6 standard errors from the true population value because of sampling error. BLS analyses are generally conducted at the 90-percent level of confidence.

The CPS data also are affected by nonsampling error. Nonsampling error can occur for many reasons, including the failure to sample a segment of the population, inability to obtain information for all respondents in the sample, inability or unwillingness of respondents to provide correct information, and errors made in the collection or processing of the data. For example, respondents may round their hourly earnings to whole dollars when answering survey questions.

Information about the reliability of data from the CPS is available on the BLS website at www.bls.gov/cps/documentation.htm#reliability.

RECOMMEND THIS PAGE USING:      Facebook      Twitter      LinkedIn

| TOOLS | CALCULATORS | HELP | INFO | RESOURCES |
|---|---|---|---|---|
| Areas at a Glance | Inflation | Help & Tutorials | What's New | Inspector General (OIG) |
| Industries at a Glance | Location Quotient | FAQs | Careers @ BLS | Budget and Performance |
| Economic Releases | Injury And Illness | Glossary | Find It! DOL | No Fear Act |
| Databases & Tables | | About BLS | Join our Mailing Lists | USA.gov |
| Maps | | Contact Us | Linking & Copyright Info | Benefits.gov |
| | | | | Disability.gov |

Freedom of Information Act  |  Privacy & Security Statement  |  Disclaimers  |  Customer Survey  |  Important Web Site Notices

U.S. Bureau of Labor Statistics | Division of Information and Marketing Services, PSB Suite 2850, 2 Massachusetts Avenue, NE Washington, DC 20212-0001
www.bls.gov/OPUB | Telephone: 1-202-691-5200 | Contact Us