1  Jaburg & Wilk, P.C.
2  3200 N. Central Avenue, 20th Floor
   Phoenix, AZ 85012
3  602.248.1000

4  Kraig J. Marton (003816)
   kjm@jaburgwilk.com
5  Jeffrey A. Silence (029143)
   jxs@jaburgwilk.com

6  Attorneys for Plaintiffs

7

8              **UNITED STATES DISTRICT COURT**

9              **FOR THE DISTRICT OF ARIZONA**

10  Joanne Zuniga, an individual, and David
11  M. Reaves, Chapter 7 Bankruptcy          Case No. CV-15-1978-PHX-DKD
    Trustee,
12                                           **ZUNIGA'S RESPONSE TO**
              Plaintiffs,                    **DEFENDANTS' MOTION FOR**
13                                           **SUMMARY JUDGMENT**
         v.
14                                           (Oral Argument Requested)
    Fiesta Pediatric Therapy, Inc., an
15  Arizona corporation; Beth Williamson,
    an individual, and Randy Williamson,
16  her husband,

17            Defendants.

18  FIESTA PEDIATRIC THERAPY, INC.,
    an Arizona corporation; BETH
19  WILLIAMSON, an individual, and
    RANDY WILLIAMSON, her husband,
20
21            Counterclaimants,

22       vs.

23  JOANNE ZUNIGA, an individual, and
    David Mr. Reaves, Chapter 7
24  Bankruptcy Trustee,

25            Counterdefendants.

26        Pursuant to FRCP 56, and D. Az LRCiv 56.1(a), Joanne Zuniga ("Zuniga") asks

27  this Court to deny Defendants' Motion for Summary Judgment (Doc. 121) and grant her

28

1  Motion for Summary Judgment on All Issues. (Doc. 124). Defendants' Motion should
2  be denied, and Zuniga's should be granted, because the Fluctuating Work Week Method
3  ("FWWM") does not apply, and there is no admissible evidence to support any of
4  Defendants' counter claims.[1]

### I.    BACKGROUND

As for the FLSA claim, the following facts are undisputed and are taken directly
from Defendants' Statement of Facts:

- "Zuniga was employed by Fiesta as front office staff. She had the specific title of Scheduler." (Def SOF ¶ 3).

- "Zuniga had a **set schedule**,[2] 7:00 AM to 6:00 PM, four days a week, Monday through Thursday, with one hour set for lunch." (Def SOF ¶30).

- Defendants stopped paying Zuniga a premium for overtime hours "[b]eginning February 1, 2011." (Def SOF ¶27).

- "Zuniga was entitled to 80 hours of vacation time per year." (Def SOF ¶53).

- Zuniga's earnings statements show she was paid on an hourly basis. (Def SOF ¶59; Def. Ex. 17 – Zuniga's earnings statements).

In other words, the core facts as to the FLSA claim are not in dispute. The core
facts as to Defendants' counter claims are not disputed, either. The following facts are
taken directly from Defendants' Statement of Facts:

- "Zuniga had a MacPractice login." (Def SOF ¶111).

- Defendants are "not sure" whether Zuniga exceeded the scope of her authorization to access information in MacPractice. Specifically, Defendants'

---

[1] Plaintiff/Counter-Defendant, David M. Reaves as Chapter 7 Bankruptcy Trustee, has filed a Motion to Dismiss because the bankruptcy estate abandoned their portion of the FLSA claim (Doc. 117). As set forth in that Motion, Bankruptcy Court Judge Collins has already ordered that the claim was abandoned. If for some reason that Motion is denied, then Mr. Reaves joins in this Response.

[2] Emphasis ours unless otherwise noted.

2

1    SOF ¶111 states: "Williamson is **not sure** [Zuniga] had to get to the ledger to
2    do scheduling."

3    • "The reason Zuniga printed the patient records was to take them off Fiesta
4      property and provide them to the State of Arizona." (Def SOF ¶104).

5    • Defendants admit, through their silence, that they have no evidence Zuniga
6      ever disclosed these records to anyone other than the Occupational Therapy
7      Board ("OT Board"). See Def SOF ¶73: "Zuniga delivered multiple boxes of
8      papers to the Board of Occupational Therapy (the "Board"), announcing they
9      were Fiesta patient records, billing records, and scheduling records."

10   • Zuniga did not take the original copy of these records – she made copies and
11     left the originals at Fiesta. See Def SOF ¶107: "Zuniga took the patient's
12     chart, medical records, notes and treatment from the filing cabinet and *made*
13     *copies.*"

14   As discussed below, these admissions are fatal to Defendants' counter claims.
15   So, too, is the actual evidence and Defendants' failure to disclose any meaningful
16   damages.

17   ## II.   ANY INFERENCE MUST BE REASONABLE.

18       Summary judgment should be granted where "there is no genuine issue as to any
19   material fact and the moving party is entitled to judgment as a matter of law." FRCP
20   56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Magnetar Techs. Corp. v.*
21   *Intamin, Ltd.*, 801 F.3d 1150, 1155 (9th Cir. 2015).

22       Federal rule of civil procedure 56(c)(2) requires that all facts be supported by
23   "admissible" evidence and the "reasonable inferences" to be drawn from such evidence.
24   *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990 (9th Cir. 2017); FRCP 56(c)(4). The
25   evidence must also be based on personal knowledge. *Id.* When a party fails to support a
26   so-called "fact" with admissible evidence based on personal knowledge, the Court must
27   reject that "fact." FRCP 56(e).

28

JABURG|WILK
Attorneys at Law

As discussed below, many of Defendants' so-called "facts" are not supported by any admissible evidence or "reasonable" inferences to be drawn from that evidence. Defendants instead wildly speculate and make assumptions about what Zuniga *may* have done. For example, Defendants claim that Zuniga stole the original copy of only one patient record, but they offer no actual evidence that she did. They instead claim that the record went missing not long after Zuniga's termination and that this is "curious." (Zuniga's response to Def SOF ¶75). This kind of speculation is not enough to withstand summary judgment. *United States v. Gossett*, 416 F.2d 565, 567 (9th Cir. 1969) (Purpose of Rule 56 is to "to eliminate sham issues of fact.").

Defendants' Statement of Fact is also full of "facts" that are not relevant to any issue. For example, Defendants claim that Zuniga was the *de facto* supervisor when Singh was gone and that Zuniga had significant discretion in how to schedule, yet they do not claim or argue she was exempt under the administrative exemption or any other exemption. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Servs., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987).

## III.    THE FWWM DOES NOT APPLY.

### i.    Defendants have the Burden of Proof.

Defendants claim that the Fifth[3] and Eleventh[4] Circuits have held that the burden of proof as to the FWWM is on the employee. (Def MSJ 3-4). Other courts, however, directly impose the burden of proof on the employer. *See, Monahan v. Chesterfield,* 95 F.3d 1263, 1275 n. 12 (4th Cir.1996); *Giles v. New York,* 41 F.Supp.2d 308, 317 (S.D.N.Y.1999); *Stokes v. Norwich Taxi, LLC*, 289 Conn. 465, 481, 958 A.2d 1195, 1206 (2008); *Blotzer v. L-3 Commc'ns Corp.,* No. CV-11-274-TUC-JGZ, 2012 WL 6086931, at *10 (D. Ariz. Dec. 6, 2012) and *Hunter v. Sprint Corp.,* 453 F.Supp.2d 44, 59 n. 17 (D.D.C.2006).

---

[3] *Samson v. Apollo Res., Inc.,* 242 F.3d 629, 636 (5th Cir. 2001).
[4] *Lamonica v. Safe Hurricane Shutters, Inc.,* 711 F.3d 1299, 1311 (11th Cir. 2013).

The *Stokes* court explained in detail why the defendant bears the burden of proof:

> A close examination of the language of § 778.114 of the federal regulations confirms that the regulation intends that the employer seeking to rely on the fluctuating workweek method must show that it applies. . . .
>
> Finally, and most persuasively, subsection (c) of § 778.114 provides in relevant part that "[w]here all the *legal prerequisites* for use of the 'fluctuating workweek' method of overtime payment are present, the [a]ct, in requiring that 'not less than' the prescribed premium of 50 percent for overtime hours worked be paid, does not prohibit paying more...." (Emphasis added.) 29 C.F.R. § 778.114(c). The regulation, therefore, expressly identifies the conditions as "legal prerequisites." Based on the language of the regulation, and the interpretive case law, we are persuaded that the more logical allocation of the burden of proof is to require the defendants to show that the conditions precedent to the application of the fluctuating workweek method were satisfied.

*Stokes*, 289 Conn. at 482–83, 958 A.2d at 1206–07.

There is another reason why the defendant should bear the burden of proof, which is that under the FWWM,

> the employee's hourly "regular rate" decreases with each additional hour worked. In fact, the difference between the FWW method and the traditional time-and a-half method can result in an employee being paid seventy-one percent less for overtime over a given year, and under the FWW method, the effective overtime hourly rate of an employee working sixty-one hours or more is less than the non-overtime hourly rate of an employee who worked no more than forty hours per week. This result is contrary to the FLSA's purpose: encouraging employers to spread employment among more workers, rather than employing fewer workers who are then required to work longer hours. *See Robertson v. Alaska Juneau Gold Min. Co. .,* 157 F.2d 876, 879 (9th Cir.1946).

*Blotzer*, 2012 WL 6086931, at *11.

In other words, the FWWM represents an extreme divergence from how employees are normally paid under the FLSA, a divergence that is very much in the employer's favor. As such, the employer should bear the burden of proof considering that the FLSA is to be construed liberally in favor of the employee. *Klem v. County of Santa Clara,* 208 F.3d 1085, 1089 (9th Cir. 2000) ("In making its decision here, the

5

1    Court is 'mindful of the directive that the [FLSA] is to be liberally construed to apply to

2    the furthest reaches consistent with Congressional direction.'") quoting *Biggs v. Wilson,*

3    1 F.3d 1537, 1539 (9th Cir. 1993).

4           In addition, the two circuit court decisions that Defendants rely on are not crystal

5    clear about whether the employee bears the burden of disproving that there was a "clear

6    mutual understanding." Instead, *Samson* held that "the employee bears the burden of

7    proving that the employer *failed to properly administer the FWW Method*." 242 F.3d at

8    636. *Lamonica* then cited *Samson* in likewise holding that "the employee bears the

9    burden of proving that *the employer failed to properly administer [it]*." 711 F.3d at

10   1311.

11

12          Proving that an employer did not honor an existing FWWM agreement is very

13   different than proving there was such an agreement in the first place. Neither circuit

14   court decision analyzed the cases we cite here or their rationale. They instead just held

15   that the DOL has not officially recognized the FWWM as an "exemption," and thus, the

16   employee bears the burden of proof. This is misguided. The FWWM is, in substance, an

17   exemption from the FLSA because it allows the employer to pay the employee under an

18   entirely different pay scheme than what is normally allowed under the FLSA, a pay

19   scheme that is significantly more favorable for the employer than even the various

20   exemptions, which require a minimum salary.

21          Regardless of who bears the burden of proof, the facts here do not support

22   applicability of the FWWM. On page 3 of their MSJ, Defendants state,

23           The FWW Method is permissible when: (1) the employee's
             work hours fluctuate from week to week; (2) the employee
24           receives a fixed salary regardless of hours worked; (3) the
             fixed salary is sufficient to provide compensation every
25           week at a regular rate that was at least equal to the minimum
             wage; (4) the employer and the employee share a "clear and
26           mutual understanding" that the employer would pay the
             fixed salary regardless of hours worked; and (5) the
27           employee receives overtime compensation at no less than
             one-half the rate of pay for hours worked in excess of forty
28

in a workweek. *See Flood v. New Hanover County*, 125 F.3d 249, 252 (4th Cir. 1997).

We agree that these are the elements, although we disagree about some of the finer points of each element. We also agree with Defendants that "[u]nless all the legal prerequisites' for applying the flexible work week method are present, an employer cannot avail itself of the flexible work week method for calculating overtime wages." *Id.; see also Monahan v. Emerald Performance Materials, LLC*, 705 F. Supp. 2d 1206, 1217 (W.D. Wash. 2010) (Granting plaintiffs' motion for summary judgment finding that the FWWM does not apply).

We address each element in the same order that Defendants did in their MSJ.

## ii.     Zuniga Never Received a "Fixed Salary."

Defendants admit that for the FWWM to apply, the employee must receive a "fixed salary." (Def MSJ 3 stating that "The FWW Method is permissible when . . . the employee receives a fixed salary regardless of hours worked."). *See also Hunter v. Sprint Corp.*, 453 F.Supp.2d 44, 59 (D.D.C.2006) (Dismissing defendants' motion for summary judgment on the FWWM defense because "the regulation requires that . . . employer pay[ ] the salary even though the workweek is one in which a full schedule or hours is not worked."); *Oliver v. Mercy Med. Ctr., Inc.*, 695 F.2d 379, 381 (9th Cir.1982) (finding insufficient evidence that the fixed salary was intended to compensate the plaintiff for all hours worked). See 29 C.F.R. § 541.602(a), defining a salary as when the "employee regularly receives each pay period on a weekly, or less frequent basis, **a predetermined amount** constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."

### a.     The Two Parties to the Supposed "Fixed Salary" Agreement Deny there was such an Agreement, and Williamson has no Personal Knowledge to Dispute That Testimony.

Defendants focus nearly all of their MSJ and SOF in arguing that Zuniga was supposedly paid a fixed salary regardless of how many hour she worked. (Def SOF

¶¶26-69; Def MSJ 2-5). Zuniga denies this and explained that she was only paid 86.67 hours per pay period because she *actually worked* 86.67 hours per pay period. (Zuniga's Response to Def SOF ¶26).

While the "salary" versus "hourly" question might, in some circumstances, be a fact issue, in this case there is no admissible evidence to support Defendants' claim. In claiming there was a salary, Defendants primarily rely on Williamson's testimony. See, e.g., Def SOF ¶34 stating that "[o]n February 1, 2011 Zuniga became a salaried employee" and citing the Williamson deposition as support for this statement.

Williamson, however, claims that Maria Singh, who was the office manager for most of Zuniga's tenure, put Zuniga on a fixed salary on February 1, 2011, but she admits that she *has no personal knowledge* about what was discussed or agreed upon. Specifically, Williamson said this in a sworn declaration:

> Ms. Singh devised and implemented this pay program for Ms. Zuniga on her own. I did not request it, implement it, or even suggest it. At no time did I have any meetings with Ms. Singh to discuss the legality of the pay structure that she implemented for Ms. Zuniga. . . .

> At no time did I have any meetings with Ms. Singh to discuss the legality of the pay structure that the she implemented for Ms. Zuniga.

(Ex. 7 to Zuniga's SOF). In another sworn declaration, Williamson said this: "Ms. Singh also made the payroll decision to modify her sister's pay structure, from an hourly wage to a salary, with overtime, <u>without my input</u> early in "2011." (Ex. 5 to Zuniga's SOF).

Singh, who was the office manager for most of Zuniga's tenure and whom Defendants claim was in charge of setting pay for all front-office staff, testified that *Zuniga was <u>always</u> paid hourly.* (See response to Def SOF ¶27). Zuniga, too, always understood that she was being paid hourly and denies that there ever was any discussion of a "fixed salary." (Response to Def SOF ¶27). All of Zuniga's earnings statements confirm that she was paid hourly – she was paid for every hour she worked, regardless of the number of hours – at the agreed hourly rate. (Response to Def SOF ¶27). In other

8

1   words, the two parties to the supposed "fixed salary" agreement deny that Zuniga was

2   ever paid a salary, and Williamson has no personal knowledge to dispute that testimony.

3        Not only does Williamson lack personal knowledge to dispute clear testimony,

4   her own actions show that she knew Zuniga was **not** paid a fixed salary. Williamson

5   drafted a repayment agreement dated October 15, 2014, which states, "You would

6   multiple [sic] the hours you worked by your current hourly rate of $19.00 and work on

7   Fridays until the debt of $1178.00 is paid in full." (Response to Def SOF ¶27; see also

8   Ex. 11 to Zuniga's SOF – loan repayment agreement).

9        Defendants' "fixed salary" argument fails as a matter of law because Zuniga and

10   Singh deny that Zuniga was ever paid a salary, and Williamson has no personal

11   knowledge to dispute this. It also fails because Zuniga testified that she was paid 86.67

12   hours per pay period *because she worked at least 86.67 hours per pay period or else*

13   *used her PTO.*  And it fails because the payroll records reflect that Zuniga was paid for

14   every hour she worked – even overtime hours – at the same hourly rate.

15
16        **b. Zuniga was Paid 86.67 Hours Per Pay Period *Because She Worked at Least 86.67 Hours Per Pay Period or Else Used PTO.***

17        Defendants claim that the salary issue "turns on whether an employer made

18   reductions from minimum base pay for work absences." (Def MSJ 5:1-2). Defendants

19   assert that the employer in *McGuire v. City of Portland* met the salary requirement

20   because the employees' minimum base pay was not ordinarily reduced for absences

21   from work. 159 F.3d 460, 464 (9th Cir. 1998).

22        While this may be the law, it does not apply here. It is wrong to argue that

23   "Zuniga's base pay was never reduced for absences or any other reason [since] she

24   always received pay for a minimum of 86.67 hours."  In fact, when she worked less than

25   full time, her pay <u>was reduced</u> – she had to use PTO. In fact, Fiesta kept track of her

26   PTO and charged her with it whenever Zuniga could not work a 40 hour week. Using

27   accrued PTO is very much a reduction of pay.

28

JABURG|WILK
Attorneys at Law

1    Zuniga explained that she was paid 86.67 hours for every pay period *because she*
2    *worked at least 86.67 hours per period <u>or else</u> she used accrued PTO*. Specifically, she
3    testified, "if I missed a day, I would make it up." (Zuniga response to Def SOF ¶¶ 54-
4    55). All of her earnings statements reflect that Zuniga was paid at her regular hourly rate
5    for every hour she ever worked, including overtime hours. (Def Ex. 17). The only
6    "predetermined" amount was her hourly rate, but her pay otherwise was entirely
7    dependent on the hours she worked. The irony is that Defendants fail to say in their
8    pleadings what "fixed salary" Zuniga was paid.

9    **iii.    There was No "Clear Mutual Understanding."**

10   Even if there were some question about whether a fixed salary was somehow to
11   be paid, there is simply no evidence anywhere of any understanding, much less a "clear
12   mutual understanding" about it. Defendants admit that there must be a "clear mutual
13   understanding" for the FWWM to apply. *See, e.g.*, 29 C.F.R. § 778.114 (requiring "a
14   clear mutual understanding of the parties that the fixed salary is compensation (apart
15   from overtime premiums) for the hours worked each workweek . . ."). (Def MSJ 6).

16   After all, Zuniga denies having any understanding about being paid a salary. She
17   denies that she was ever even told she was being paid a salary at all, as she has
18   consistently testified that she was always an hourly employee. (Zuniga SOF ¶¶23-28).

19   Singh denies reaching any understanding with Zuniga, either. She testified that
20   she was only a biller, and not the office manager on February 1, 2011, when Zuniga
21   stopped receiving any overtime premium. (Zuniga SOF ¶¶7-10). According to Singh,
22   Zuniga continued to be an hourly employee, and it was Williamson who unilaterally
23   made the decision to stop paying overtime premiums to Zuniga. (Zuniga SOF ¶¶16-19).
24   Singh testified that Williamson asked her if Zuniga and another employee "would mind
25   working at a regular rate versus getting paid overtime," (Zuniga SOF ¶17) and Singh
26   told Williamson to ask Zuniga. (Zuniga SOF ¶18). According to Singh, Williamson
27   "understood that it was . . . illegal" not to pay Zuniga 1.5x her normal hourly rate for
28   overtime hours. (Zuniga SOF ¶20).

JABURG | WILK
Attorneys at Law

1    Singh and Zuniga testified that they had never heard of the FWWM or any
2  payment scheme of that sort until after this lawsuit was filed. (Zuniga SOF ¶29). They
3  testified that there was never any kind of discussion – let alone any "clear mutual
4  understanding" – that Zuniga would work be paid a fixed salary at all. (Zuniga SOF
5  ¶30). Rather, Zuniga did not object when she was told she was to be paid hourly at
6  straight time, including straight time for all overtime hours, because she was told that
7  Fiesta "will hire someone else" if she demands a premium pay for overtime hours.
8  (Zuniga SOF ¶31).

9    Williamson has no personal knowledge to dispute Singh's and Zuniga's
10 unequivocal testimony. Williamson was asked, "Do you know what agreement was
11 made between [Singh] and [Zuniga], with respect to how [Zuniga] was to be paid?" She
12 responded, "No." (Zuniga SOF ¶ 32). She confirmed this in two sworn declarations.
13 (Ex. 5 and 7 to Zuniga's SOF).   Williamson claims that Fiesta stopped paying Zuniga a
14 premium for overtime because Singh, "made the payroll decision to modify her sister's
15 pay structure, from an hourly wage to a salary with overtime" (Zuniga SOF ¶22).
16 However, Williamson has repeatedly denied having **any role** in the decisions about how
17 Zuniga was paid, and she denies having any personal understanding at all with Zuniga
18 (Zuniga SOF ¶¶32-40).

19   In their Statement of Facts, Defendants say almost nothing about when and how
20 Singh and Zuniga supposedly entered into some type of FWWM agreement. The only
21 thing they say is this: Williamson "saw in CompuPay that Zuniga was making a
22 tremendous amount of additional money and Williamson questioned Singh about that.
23 She said, 'Oh, I told you,' I told you this, and I told you that.'" Singh might have said,
24 'she works very hard.'" (Def SOF ¶43). This vague testimony does nothing to disprove
25 Williamson's own sworn declarations or the testimony of Zuniga and Singh that there
26 was no such FWWM discussion or agreement.

27   Courts have dismissed FWWM claims because of the lack of evidence about any
28 clear mutual understanding. *Russell v. Wells Fargo & Co.*, 672 F. Supp. 2d 1008, 1013

JABURG|WILK
Attorneys at Law

11

(N.D. Cal. 2009) (dismissing defendants' FWW defense because there was no "clear mutual understanding that a fixed salary will be paid for fluctuating hours, apart from overtime premiums."); *Monahan v. Emerald Performance Materials*, LLC, 705 F. Supp. 2d 1206, 1217 (W.D. Wash. 2010) (same); *Peterson v. Snodgrass*, 683 F. Supp. 2d 1107 (D. Or. 2010) (same) ("[T]he record reveals no evidence of a "clear mutual understanding" between the Snodgrasses and Peterson that her $50,000 annual salary was intended to compensate her for all hours she worked, no matter how many or how few.").

There is no fact issue as to whether there was a clear mutual understanding because the only two parties to the supposed agreement – Zuniga and Singh – deny there was such an agreement, and Williamson claims she does not have any personal knowledge about this supposed agreement.

### iv.    Joanne's hours did not fluctuate <u>below</u> 40 "from week to week."

Defendants point out that the Seventh, Fifth, and Fourth Circuits have held that an employee's hours need not ever fluctuate below 40 hours. *See Urnikis-Negro v. American Fam. Prop. Servs.*, 616 F.3d 665, 683-84 (7th Cir. 2010); *Aiken v. County of Hampton*, 1998 WL 957458 at *3 (4th Cir. 1998); *Yadav v. Colemen Oldsmobile, Inc.*, 538 F.2d 1206, 1207-08 (5th Cir. 1976).

But in each of the following cases, the court found that the FWWM did not apply because the employee's hours never fluctuated below 40. *Blotzer v. L-3 Commc'ns Corp.*, No. CV-11-274-TUC-JGZ, 2012 WL 6086931, at *12 (D. Ariz. Dec. 6, 2012) (in granting summary judgment for the employee, the court said the "FWW was intended to apply to 'fluctuating' work schedules, i.e. schedules in which an employee endures long hours some weeks *but enjoys the benefit of short hours in other weeks*, all at the same rate of pay."); *Hasan v. GPM Investments, LLC*, 896 F. Supp. 145, 150 (D. Conn. 2012) (Denying defendants' motion as to the FWWM defense because "*plaintiffs never had a short week*; GPM's job description stated that store managers were expected to work a minimum of 52 hours per week."); *Heder v. City of Two Rivers*, 295 F.3d 777,

779–80 (7th Cir. 2002) (Defendant's scheme did not comport with the FWW's requirements because "its firefighters never work fewer than 216 hours in a 27–day period. *There is no shortfall of time (and correspondingly higher hourly rate) in one pay period that might make up for longer work in another*."). *Spataro v. Gov't Employers Ins. Co.,* No. 13-CV-5020 JS ARL, 2014 WL 3890222, at *2 (E.D.N.Y. Aug. 6, 2014) (The FWW method "may be used only where the employee's hours actually fluctuate above *and below* the normal forty-hour workweek."); *Costello v. Home Depot USA, Inc.,* 944 F. Supp. 2d 199, 208 (D. Conn. 2013) ("*For a fluctuating work week arrangement to make sense to both parties, employees should offset their relative loss from a grueling work week far above forty hours with the benefit of full pay for weeks that clock-in at less than forty hours*. Otherwise, employees have not bargained for anything but decreasing marginal pay as they work longer and longer hours at work."); *Mian v. GPM Invs., LLC*, 896 F. Supp. 2d 145, 150 (D. Conn. 2012) ("[V]ariance, between weeks with a moderate amount of overtime hours, and weeks where a majority of hours worked exceeded the 40 hour threshold, *is not the same as the up and down fluctuation contemplated by the DOL and by the Court in Missel*.").

29 C.F.R. § 778.114(c) also contemplates that employees will work less than 40 hours in certain weeks. 29 C.F.R. § 778.114(c) states, "Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks **as well as short ones**, under the circumstances of the employment as a whole." These cases have the better reasoning because if the employee never works less than 40 hours, "there is no shortfall of time (and correspondingly higher hourly rate) in one pay period that might make up for longer work in another." *Heder*, 295 F.3d at 779–80.

The three Circuit court decisions cited by Defendants are hardly persuasive. In *Urnikis-Negro*, The court held that "cases like this one, where the employee has routinely worked more than a 40-hour week, do not truly fit the fluctuating workweek

paradigm, in that the employee's hours rarely if ever drop below 40." 616 F.3d at 683 (7th Cir. 2010). The Fourth Circuit decision is unpublished, and the Court did not engage in any real analysis about this issue. *Aiken*, 1998 WL 957458 at *3 (4th Cir. 1998). It did not address any of the arguments we have raised here. *Id.* The Fifth Circuit decision is only one page. *Yadav*, 538 F.2d at 1208 (5th Cir.) It devotes *no analysis, whatsoever*, to whether the FWWM applies when the employee never works less than 40 hours per week. The Court is not obligated to follow these pithy decisions and should not do so because if the employee never works less than 40 hours, "there is no shortfall of time (and correspondingly higher hourly rate) in one pay period that might make up for longer work in another." *Heder*, 295 F.3d at 779–80.

Defendants claim that even if this Court requires fluctuation below 40 hours, "Zuniga's hours actually fluctuated below 40 at times. [SOF ¶¶ 53-68.]" (Def MSJ 8). This is false. Defendants admitted in their own SOF that "Zuniga had a **set schedule**, 7:00 AM to 6:00 PM, four days a week, Monday through Thursday, with one hour set for lunch." (Def SOF ¶30). Zuniga's earnings statements also show that she never worked less than 86.67 hours per pay period, unless she was charged PTO. See Def. Ex. 17.

**v.    The Charging of Zuniga's PTO Bank is Fatal to the FWWM Defense.**

Defendants cite cases stating that the docking of an employee's PTO or vacation bank does not defeat the application of a salary test. (Def MSJ 8). However, a different result must be found under the FWWM when a PTO bank is docked for every hour taken. *See, e.g. Brantley v. Inspectorate Am. Corp.*, 821 F. Supp. 2d 879, 891 (S.D. Tex. 2011) ("Under the FWW, employers are not allowed to make deductions to an employee's fixed salary for sick leave or vacation leave, even if the employee has not yet accrued sufficient leave to cover their absence."); *Hunter v. Sprint Corp.*, 453 F.Supp.2d 44, 60–61 (D.D.C.2006) (same).

Defendants then argue that even if such deductions were fatal to its FWWM defense, Zuniga was given an "unending" amount of PTO. (Def MSJ 9:14). This is not

1   supported by any evidence. The Administration Manager of Fiesta, Lupe Bugarin,

2   testified that "every staff member" receives 80 hours of PTO per year and that "every

3   time they use PTO, it just subtracts." (Response to SOF ¶54). Williamson was asked,

4   "Your hourly employees, whether they're hourly or salary, get the same PTO, don't

5   they?" She responded, "I think so, yes." (Response to SOF ¶54).

6         In response to Defendants' SOF ¶54, we explained that Zuniga was never given

7   more than 80 hours of PTO in any given year. Singh, the office manager and person

8   who Williamson claims was put in charge of  all issues relating to the front office staff,

9   was asked, "Did Joanne ever get extra time off beyond the time that was allowed in the

10  policy?" She responded, "No." (Response to SOF ¶54).

11        Zuniga confirmed this and testified that Fiesta did not always pay Zuniga for

12  every hour she worked – Fiesta would instead sometimes add hours that she worked to

13  her PTO bank and not record those hours on any earnings statement. (Response to SOF

14  ¶54). In other words, Fiesta replenished Zuniga's PTO bank during year rather than

15  paying her. (Response to SOF ¶54). Thus, her supposed taking of 150 hours of PTO is

16  misleading because she was really just being paid for hours she had previously worked,

17  but was not paid. Specifically, Zuniga testified that "we would work extra hours, and it

18  would be added as vacation time versus being paid. . . . They added the hours to that

19  bank." (Response to SOF ¶54).

20        Zuniga further testified that if she took more than 80 hours of PTO in a given

21  year, Fiesta would subtract those hours from the following year. (Response to SOF

22  ¶54).). She believes that Fiesta may have subtracted PTO hours in 2013 because she

23  may have used more than 80 hours of PTO in 2012. (Response to SOF ¶54). She

24  explained that *she was never given more than 80 actual hours of PTO in any given year*

25  as a result of these schemes. (Response to SOF ¶54).  Zuniga explained that "There's a

26  lot of nonsense going on" at Fiesta in terms of vacation pay. (Response to SOF ¶54).

27        The FWWM does not apply because Defendants charged Zuniga's PTO bank

28  whenever she missed time from work.

15

### vi.   The Regular Rate did Not "Vary From Week to Week."

Defendants ignore this element in their Motion, but there is another reason why the FWWM does not apply. Under 29 C.F.R. § 778.114, "the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week." "Courts have framed the FWW method as being available to employers only when five criteria are satisfied, one being that employees receive a 50% overtime premium for all hours worked in excess of 40 during a week." *Ramos v. Telgian Corp.*, No. 14CV3422PKCLB, 2016 WL 1959746, at \*4 (E.D.N.Y. May 3, 2016) (Certifying for review "whether the failure to calculate regular and overtime rates in the manner prescribed by the FWW regulation alone strips an employer of the benefits of the FWW scheme"). In certifying the issue for review, the *Ramos* court noted that the "FWW regulation does not contain language . . . permitting employers to avoid weekly regular and overtime rate computations and simply pay extra half-time pay by dividing employees' salaries by 40 hours."

The rate paid to Zuniga never varied. It is undisputed that Zuniga was always paid at her regular hourly rate, regardless of the number of hours she worked. (Def SOF ¶42: Zuniga was paid "only straight time equivalent for overtime hours. . . .This lasted for some three years, until her last day of employment."). This is yet another reason why the FWWM does not apply.

### IV.   THE 3-YEAR STATUTE OF LIMITATIONS APPLIES.

Defendants make a less than half-hearted attempt to argue that the Court should apply the two-year statute of limitations. Defendants cite no facts in support of their argument and completely ignore that the Court must apply a three-year statute of limitations if there is a "willful violation". 29 U.S.C. § 255. Conduct is considered "willful" if "the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 920 (9th Cir. 2003)

16

(Employer's "reckless belief that formal separation of the two entities would justify nonpayment of overtime wages is legally insufficient as a good faith defense."). While the issue of willfulness can be a question of fact, courts do not hesitate to grant summary judgment on the issue when the facts support it. *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003) (affirming summary judgment finding that the employer's conduct was "willful").

We explained in our Motion for Summary Judgment (Doc. 124) why the Court should apply the three-year statute of limitations. See Zuniga MSJ 10-12. We will not repeat that information here. We also explained why the Court should award liquidated damages and why Williamson is personally liable, (Zuniga MSJ 12-14). Defendants did not address those issues in their cross Motion for Summary Judgment.

## V.   ZUNIGA IS NOT ESTOPPED.

Defendants make another less than halfhearted attempt to argue that Zuniga is estopped from asserting her overtime claim because she failed to disclose her claim to the bankruptcy trustee, citing *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783-84 (9th Cir. 2001) (Def MSJ 10).

This defense fails by simply looking at the factors the court in *Hamilton* examined in applying judicial estoppel. First, Zuniga's position in this case is not "clearly inconsistent" with the position she took in the bankruptcy court. *See* 270 F.3d at 782. While Zuniga initially failed to disclose the claim on her schedules, she did disclose her claim to the Trustee, who allowed her to proceed and who appeared in this case.

Second, Zuniga did not succeed "in persuading a court to accept that party's earlier position" because the bankruptcy estate was re-opened. *Id.* In fact, it was re-opened on October 22, 2015, only twenty days after this action was removed to federal court. (See Doc. #11- Motion for Leave to File First Amended Complaint).  And Zuniga

1   is in no way seeking to obtain an "unfair advantage or impose an unfair detriment" on

2   defendants – she seeks to pursue the claim she has now fully disclosed to the

3   bankruptcy court and to this court.

4        There are two other considerations. First, Zuniga's failure to disclose was not

5   intentional. Zuniga testified that "yes, it's my fault, and, yes, I'm doing right and brought

6   the bankruptcy, and we communicated, and we're settling everything correctly with him.

7   I had -- I had no clue." (Response to Def SOF ¶116). Second, the bankruptcy estate

8   abandoned the claim, anyway, due to Defendants' scorched Earth litigation tactics that

9   made it no longer worthwhile to pursue. (Doc. #117 and 128).

10  **VII.   ZUNIGA DID NOT BREACH HER DUTY OF LOYALTY OR**

11  **CONVERT ANYTHING.**

12       Defendants claim that Zuniga "admitted" to stealing patient records in December

13  2014. (Def MSJ 10). They also clarify, for the first time, that their "misappropriation"

14  claim is really a conversion claim. (Def MSJ 11).

15       Zuniga did not admit to "stealing" anything. (Response to Def SOF ¶¶84; 106).

16  And Defendants presented no actual evidence that she did. (See Zuniga SOF ¶¶ 137-

17  145). In fact, Defendants admitted the following *in their own SOF*.

18       • "The reason Zuniga printed the patient records was to take them off Fiesta

19         property and provide them to the State of Arizona." (Def SOF ¶104).

20       • Defendants admitted, through their silence, that they have no evidence Zuniga

21         ever disclosed these records to anyone other than the OT Board. See Def SOF

22         ¶73: "Zuniga delivered multiple boxes of papers to the Board of Occupational

23         Therapy (the "Board"), announcing they were Fiesta patient records, billing

24         records, and scheduling records."

25       • Zuniga did not take the original copy of these records – she made copies and

26         left the originals at Fiesta. See Def SOF ¶107: "Zuniga took the patient's

27         chart, medical records, notes and treatment from the filing cabinet and *made*

28         *copies*."

JABURG|WILK
Attorneys at Law

18

1   These admissions are fatal to Defendants' claim that Zuniga stole or converted

2   anything because they demonstrate that all Zuniga did was make copies that she

3   provided to an important state Board, on that board's request. As we explained in the

4   Zuniga SOF ¶¶117-19, a state investigator asked Zuniga to print copies of these records

5   to provide evidence of billing fraud and unlawful discrimination.

6          As for medical records, we explained in our MSJ that Zuniga is a whistleblower

7   who is protected by the public policy found in A.R.S. § 23-1501(A)(3)(c)(ii) to report to

8   a government agency that her employer has engaged in fraud. This public policy is an

9   exception to any purported contractual or legal duty of loyalty Zuniga may have to

10  Fiesta. *See* Restatement (Second) of Contracts § 178 (public policy exceptions to the

11  enforcement of contracts); *see also Siebert v. Gene Sec. Network, Inc*, 2013 WL

12  5645309, at *7-8 (N.D. Cal., Oct. 16, 2013) (employer's claim against False Claims Act

13  [FCA] whistleblower-plaintiff for taking and disclosing confidential documents was

14  dismissed because "any alleged obligation by [plaintiff] not to retain or disclose the

15  confidential documents that form the basis of this action is unenforceable as a matter of

16  public policy … namely, the public policy in favor of providing incentives for

17  whistleblowers to come forward, file FCA suits, and aid the government in its

18  investigation efforts"), *citing U.S. v. Cancer Treatment Ctrs. of Am.*, 350 F. Supp. 2d

19  765, 773 (N.D. Ill. 2004) (Relator was exempt from liability for breach of

20  confidentiality agreement for disclosing documents showing employer engaged in

21  fraudulent healthcare billing); *see also U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp.

22  2d 1033, 1039 (C.D. Cal. 2012) (denying motion to strike exhibits because FCA

23  "[r]elators sought to expose a fraud against the government and limited their taking to

24  documents relevant to the alleged fraud").

25         Defendants claim that Zuniga stole the original copy of only one patient record

26  (Def SOF ¶¶74-75), but they offer no actual evidence that she did. They instead claim

27  that the record went missing not long after Zuniga's termination and that this is

28  "curious." (Zuniga's response to Def SOF ¶75). This kind of speculation is not enough

JABURG|WILK
Attorneys at Law

1    to withstand summary judgment. *Gossett*, 416 F.2d at 567 (Purpose of Rule 56 is to "to

2    eliminate sham issues of fact.").

3        Defendants have no evidence that Zuniga stole the original copy of anything, and

4    her making copies of records and providing them to Board is not actionable as a matter

5    of law. Defendants' claims also fail as a matter of law because they have not disclosed

6    any damages. (See Zuniga SOF ¶150).

7        **VIII. Zuniga did Not Violate the CFAA.**

8        The CFAA is primarily a criminal statute. *See generally* 18 U.S.C. § 1030.

9    Subsection (a)(4) of the CFAA requires that Defendants prove that Zuniga

10

> knowingly and with intent to defraud, accesse[d] a protected
> computer without authorization, or exceeds authorized
> access, and by means of such conduct furthers the intended
> fraud and obtains anything of value, unless the object of the
> fraud and the thing obtained consists only of the use of the
> computer and the value of such use is not more than $5,000
> in any 1-year period;

11

12

13

14

15    Defendants admit that "[t]he Ninth Circuit has previously ruled that an employee

16    who accesses company systems with an improper purpose has *not* violated the CFAA."

17    (Def MSJ 13). They point out that other circuits have reached different decisions but

18    that this Court has an "obligation to follow Ninth Circuit precedence on this matter."

19    (Def MSJ 13). In other words, Defendants admit that Zuniga's motives do not matter.

20        Defendants assert that even though Zuniga had access to MacPractice, she

21    accessed records on MacPractice that she was not permitted to access because "[h]er

22    normal job duties, including administrative support and patient scheduling, did not

23    necessitate access to patient treatment notes. [SOF ¶ 111.]" (Def MSJ 12-13).

24        Defendants, however, offered no evidence to support this claim. In fact, *they*

25    *admit in their SOF ¶111 that they are "not sure" whether Zuniga exceeded the scope of*

26    *her authorization*. Defendants says this: "Williamson is *not sure* she had to get to the

27    ledger to do scheduling." It is disappointing that Williamson is still "not sure" whether

28    Zuniga had authority to access all of the information in MacPractice, and yet, they have

   sought summary judgment on that claim. Zuniga explained that she had authority to

20

1  access any record she wanted in MacPractice and that she never altered or damaged any

2  record or computer in doing so. (Zuniga SOF ¶114-130).

3       Defendants also accused Zuniga of accessing CompuPay without authorization to

4  access her earnings statements. Zuniga explained that Griselda Munteon printed them

5  when she asked her to after explaining that she may need them for her bankruptcy.

6  (Response to SOF ¶99).

7       Although Muneton denies this, Defendants' CFAA claim as to the accessing of

8  CompuPay must also be dismissed because *they have failed to disclose any meaningful*

9  *damages*. (See Zuniga SOF ¶ 150; see also Zuniga MSJ 20-21). All Zuniga supposedly

10 did was print her earnings statements. How could that have possibly caused any

11 damage? Defendants have yet to tell us.

12 **XI.   CONCLUSION**

13      Defendants have turned a dispute over just $8,394.73 in overtime wages into

14 scorched-Earth litigation. We ask this Court to stop the madness. Defendants have

15 deposed Zuniga, in a costly video deposition, deposed all of her family members

16 connected with Fiesta, and conducted exhaustive discovery. Despite their witch hunt,

17 Defendants have not come forward with any actual evidence of wrongdoing, and in any

18 event, have not disclosed any meaningful damages. Instead, it is more apparent than

19 ever that Zuniga should have been paid an overtime premium, yet she was not.

20      Defendants' Motion for Summary Judgment should be denied, and Zuniga's

21 Motion for Summary Judgment on All Issues should be granted with fees and costs to

22 Zuniga.

23      DATED this 20th day of April, 2017.

24

25              **JABURG & WILK, P.C.**

26              /s/ Kraig J. Marton
                Kraig J. Marton
27              Jeffrey A. Silence
                3200 N. Central Avenue, 20th Floor
28              Phoenix, AZ 85012
                Attorneys for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Certificate of Service*

I hereby certify that on 20th day of April, 2017, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Christopher M. Mason
cmason@jsslaw.com
Lindsay G. Leavitt
lleavitt@jsslaw.com
Jennings, Strouss & Salmon, PLC
One East Washington Street, Suite 1900
Phoenix, Arizona 85004-2554

Michael L. Schwartz
Schwartz@schwartzlawfirmaz.com
MICHAEL L. SCHWARTZ, PLLC
7702 East Doubletree Ranch Road, Suite 300
Scottsdale, AZ  85258
*Attorneys for Defendants*

/s/ Kim Rogers

JABURG|WILK
Attorneys at Law

22