WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joanne Zuniga, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>Fiesta Pediatric Therapy Incorporated, et al.,<br><br>        Defendants. | No. CV-15-1978-PHX-DKD<br><br>**ORDER** |

Plaintiff Joanne Zuniga alleges that her former employer, Defendant Fiesta Pediatric Therapy Inc. ("Fiesta"), failed to adequately compensate her under the Fair Labor Standards Act ("FLSA"). Fiesta disagrees. Discovery has closed and pending before the Court are four related motions. (Docs. 111, 117, 121, 124) The Court has federal question jurisdiction and, upon the parties' consent to Magistrate Judge jurisdiction, pursuant to 28 U.S.C. § 636(c). (Doc. 8)

<u>Zuniga's Motion for Summary Judgment</u>. Zuniga is prosecuting a claim to recover compensation under the FLSA. (Doc. 14) As she acknowledges, because Zuniga is "seeking to recover unpaid minimum wages or overtime under the FLSA [, she] 'has the burden of proving that [s]he performed work for which [s]he was not properly compensated.'" *Brock v. Seto*, 790 F.2d 1446, 1447–48 (9th Cir. 1986) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). This is not an "impossible burden" but requires that "[s]he produces sufficient evidence to show the amount and extent of that work as a matter of a just and reasonable inference." *Mt.*

*Clements Pottery*, 328 U.S. at 687.  Zuniga claims that she has met her *prima facie* case by submitting her complete collection of paystubs and so she is entitled to summary judgment on her overtime claim.[1]  (Doc. 1-1, Doc. 124 at 12:3-6)  The Court disagrees.

It appears undisputed that Fiesta paid Zuniga on a bi-monthly basis.  (Doc. 1-1)  In other words, Fiesta paid Zuniga 24 times a year.  Thus, each pay period covered an average of 86.67 hours.[2]  This kind of pay period, although not improper, means that there are a different number of work days in each period and so it does not easily reconcile with hourly work.  It is undisputed that Zuniga's regular weekly schedule was to work four 10 hour days.  (Doc. 120 at ¶ 43, 44, 46)  This means that she would have regularly fluctuated between eight and nine days in any pay period and, depending on holidays, would have had pay periods with as few as seven days.  For example, September 1-15, 2013, would have been a pay period with seven work days for Zuniga whereas April 1-15, 2013, would have had nine work days for her.[3]

Zuniga has claimed that some weeks she worked only her regular work schedule, namely four 10 hour days.  (Doc. 1-1, Doc. 120 at ¶¶ 43-46)  She has also claimed she is owed overtime for *all* of the hours she worked over 86.67 in a given pay period.  (Doc. 124 at 12)  In other words, she acknowledges that her regular schedule was four 10 hour days per week, that she worked her regular schedule some pay periods, but also that she worked a minimum of 86.67 hours per pay period.  However, these three assertions are facially inconsistent and she has not presented any way to harmonize them.

An additional wrinkle exists when attempting to reconcile a pay period's 86.67 hours with her paystub's use of vacation time.[4]  For example, for the first half of October

---

[1] Because the Court concludes that Zuniga has not met her *prima facie* case, the Court will not address arguments about the fluctuating work week.

[2] This is calculated by multiplying 40 hours a week times 52 weeks a year divided by 24 pay periods.

[3] If the pay period had nine working days, and so work and vacation time should add up to 90 hours, several additional and unanswered questions present themselves.

[4] Zuniga claims she had only 80 hours of vacation and paid time off but her paystubs document significantly more. (Doc. 1-1 at 34, 59, 82, Doc. 120 at ¶28)  She has

- 2 -

2012, Zuniga's paystub shows she was on vacation for 80 hours but also worked 6.67 hours. (Doc. 1-1 at 54) Consistent with her allegation that she worked ten hour days, this implies that she was on vacation for eight days. It is unclear if she actually worked 6.67 hours that pay period or whether she was on vacation for eight work days and the extra 6.67 hours was added as an accounting tool to give her a full paycheck. To further complicate matters, the Court notes that this pay period included Columbus Day, a holiday with inconsistent observance by the business community, and so this pay period may have had eight days but it may have had nine days depending on Fiesta's (heretofore unexplained) operations.

Finally, as previously highlighted by the Court, her paystubs contain other patterns that, left unexplained, preclude confidence in their accuracy. (Doc. 43) There are paystubs that show Zuniga worked less than full time, i.e., under 86.67 hours, and then used so much vacation time that her paystub shows she worked more than 86.67 hours. (Doc. 1-1 at 29, 41, 36). There is a paystub that show Zuniga worked full time, i.e., 86.67 hours, but was also paid for vacation time. (Doc. 1-1 at 17) There are also several paystubs that show Zuniga worked more than full time, i.e., over 86.67 hours, and was also paid for vacation time. (Doc. 1-1 at 20, 48, 50, 64, 66, 67) In all of these scenarios, Zuniga has claimed she is owed overtime for all of the time listed in her paystubs over 86.67 hours. Without additional explanation, the Court cannot agree.

Finally, the Court notes that Zuniga is claiming she is owed overtime for hours worked to pay off a personal loan from Williamson, not Fiesta. However, she has not provided any explanation or citation to support her claim and so the Court cannot say that this kind of unusual arrangement is covered by FLSA's requirements.

As a result of these various categories of unanswered questions, the Court cannot say that the just and reasonable inference is that Zuniga worked the hours stated in her paystubs. Accordingly, summary judgement is not available for her FLSA claims.

---

not provided any documentation to support her claim.

- 3 -

1   Fiesta's Motion for Summary Judgment.  The parties do not dispute that, before her employment at Fiesta ended, Zuniga obtained copies of all of her paystubs and that she obtained copies of Fiesta's billing documents and provided them to the Arizona Board of Occupational Therapy ("AzBOT") and the Arizona Health Care Cost Containment System ("AHCCCS").  (Doc. 124 at 16)  Zuniga disputes Fiesta's allegation that she also took an original patient file.  (Doc. 139 at 18)

Based on her handling of these documents, Fiesta filed a cross-claim against Zuniga for violations of the Computer Fraud and Abuse Act at 18 U.S.C. § 1030 ("CFAA"), breach of the duty of loyalty, and misappropriation.  (Doc. 56)  Both sides have moved for summary judgment on these cross-claims.[5]

*CFAA Claims.*  Fiesta acknowledges that this Court is bound by precedent to conclude that Zuniga's actions in accessing Fiesta's computer system did not violate the CFAA.  (Doc. 124 at 13)  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009).  Fiesta has also abandoned its claim that Zuniga violated the CFAA by causing damages in excess of $5,000.  (Doc. 56 at 13, Doc. 139 at 18)

Instead, Fiesta argues that Zuniga's actions violated the CFAA because she impaired the treatment of a patient.  (Doc. 56 at 13)  This damages claim is premised on Fiesta's claim, disputed by Zuniga, that she took the patient's file when she stopped working at Fiesta.  It appears undisputed that Fiesta employees first noticed that a patient's file was missing after Zuniga separated from Fiesta.  (Doc. 139 at 18-19)  However, Fiesta has only linked Zuniga to this missing patient file with supposition and allegations.  (Doc. 122 at 12, Doc. 138 at 19)  Without more, this is insufficient to establish a *prima facie* case and so Fiesta is not entitled to any relief under the CFAA.

*State Claims*.  Fiesta alleges that Zuniga's actions in submitting documentation to investigators for AzBOT and AHCCCS constituted misappropriation and a breach of the duty of loyalty under Arizona law.  (Doc. 56)  The Court finds that Zuniga's interaction

---

[5] Fiesta also moved for summary judgment in favor of Randy Williamson, a named defendant.  (Doc. 139 at 14)  This argument was made without any evidentiary support and, therefore, must be denied.

- 4 -

with AzBOT and AHCCSS fall under the statutory immunity provisions provided by Ariz. Rev. Stat. § 32-3442(C) and § 36-2918.01(B).[6] As a result, the Court concludes that Fiesta's state law counter-claims fail as a matter of law.[7]

For the reasons stated above, the Court will grant summary judgment against Fiesta on all three of its counterclaims.

<u>Bankruptcy Trustee</u>. In October 2014, towards the end of her employment at Fiesta, Zuniga filed for personal bankruptcy protection. Her bankruptcy filings did not include any claim that Fiesta owed her overtime payments. Fiesta moved to dismiss some of Zuniga's claims arguing that a portion of her claims belonged to her bankruptcy estate. In response, Zuniga amended her complaint to add a bankruptcy trustee ("Trustee") to pursue the relevant portion of her FLSA claims. (Docs. 9, 10, 11, 12)

On December 21, 2016, Trustee filed a Notice of Intent indicating that the estate would abandon pursuit of the FLSA claim. (2:14-bk-15996-DPC ("BK") Doc. 32) On December 22, 2016, Fiesta noticed Trustee's deposition. (Doc. 91) On January 18, 2017, the Court approved Trustee's intent to abandon. (BK Doc. 35) That same day, Trustee was deposed by Fiesta's counsel. (Doc. 127 at 13)

Now, both sides agree that the Bankruptcy Trustee should be dismissed with prejudice. (Docs. 127 and 128 at 2) The unresolved question is whether fees should be awarded. Fiesta claims that it incurred significant expenses because Trustee did not promptly abandon the claim but the only specific expense noted is the cost of Trustee's deposition. Specifically, Fiesta argues that Trustee could have been dismissed before his deposition and that Trustee "only announced" his intent to abandon the Estate's claim "well into his deposition." (Doc. 127 at 2) This argument falls flat. Trustee filed a public document titled "Notice of Intent to Abandon Property" in a court docket that,

---

[6] Fiesta claims that Zuniga's actions in this regard were part of a "vindictive agenda" but raises this argument in a footnote and without any citation to the record. (Doc. 139 at 19, n.5) Accordingly, the Court considers this argument waived.

[7] Fiesta also claims that Zuniga's actions have left it exposed to possible HIPPA liability. However, this claim is unavailing. 45 C.F.R. § 164.512(d).

based on its Motion to Dismiss, Fiesta had known about and this filing occurred the day *before* Fiesta noticed Trustee's deposition. Accordingly, Fiesta's claims of surprise are not well taken and Plaintiff/Counter-defendant Reaves will be dismissed from this case with prejudice.

Motion to Disqualify. Zuniga worked at Fiesta at the same time as her sister, Maria Singh, and both left Fiesta around the same time. In November 2014, after her employment at Fiesta ended, Maria Singh hired the law firm of Jaburg Wilk to represent her in a dispute with Fiesta. That representation lasted a few months and the matter settled. (Doc. 114 at 3)

In August 2015, Zuniga—represented by Jaburg Wilk—initiated this case in Maricopa County Superior Court. (Doc. 1-1) In November 2015, Fiesta removed the case to this Court and subsequently moved to dismiss. (Docs. 1, 18) In January 2016, in response to Fiesta's motion to dismiss, Zuniga included an affidavit from Singh about Fiesta's business practices. (Doc. 23 at 74-76) In her affidavit, Singh acknowledged that her job title at Fiesta was "Office Manager" but disclaimed managerial responsibilities. (Doc. 23 at 74)

Fiesta objected to Singh's affidavit arguing, in part, that Singh's job duties included managing Zuniga's payroll and so Jaburg Wilk's contact with her violated ER 4.2. (Doc. 24) The Court heard oral argument, accepted supplemental briefing, granted Fiesta a standing objection to Singh's affidavit, and denied Fiesta's motion to dismiss. (Docs. 38, 39, 40, 43)

On June 30, 2016, the parties filed their Joint Case Management Report. (Doc. 51) In it, Fiesta noted that it "anticipate[d] filing a motion to compel seeking communications between counsel for Plaintiffs and Maria Singh concerning this case." (Doc. 51 at 9:14-15) Zuniga noted that she "intend[ed] to continue to assert the attorney-client privilege as to its communications with Maria Singh concerning its prior representations of Ms. Singh before this lawsuit was initiated. Plaintiffs may also assert work product with respect to some of its communications with Ms. Singh." (Doc. 51 at

11:11-14)  On July 7, 2016, the Court conducted its Rule 16 Case Management conference and issued the case management order the same day.  (Doc. 54)

On July 11, 2016, Zuniga's counsel at Jaburg Wilk sent an email to David Kresin, a lawyer at Robaina & Kresin PLLC, about "possible representation of Ms. Singh." (Doc. 111 at 64)  Over the following 11 days, there were several emails and an in-person meeting about Mr. Kresin's representation of Singh, discussions of the case, and a conflict check.  (Doc. 111 at 64, 67)

On October 13, 2016, Zuniga's counsel had a phone call with Mr. Kresin about the "deposition of Ms. Singh."  (Doc. 111 at 67)  Between October 13 and 17, 2016, Zuniga's counsel emailed Mr. Kresin "attaching some of the key pleadings in this lawsuit and discussing logistics," "confirming oral C[ommon] I[nterest] agreement," and "billing."  (Doc. 111 at 65)

On November 7 and 8, 2016, Mr. Kresin emailed Fiesta's counsel, copying Zuniga's counsel, and stated that "Maria Singh has retained me to represent her with respect to her role as a witness in [this] case."  (Doc. 111 at 186)  On November 8, Mr. Kresin was served with a subpoena by Fiesta's counsel.  (Doc. 75; Doc. 84 at 14-21)  On November 10 and 11, Zuniga's counsel emailed Mr. Kresin about the Fiesta subpoena and they had a phone call about the same topic.  (Doc. 111 at 65, 67)  On November 17, Mr. Kresin objected to the subpoena stating, in part, "[t]hrough counsel, Ms. Zuniga and Ms. Singh entered a common interest agreement to keep confidential and privileged all documents shared between them."  (Doc. 84 at 12)

On December 9, Zuniga's counsel and Mr. Kresin had a phone call and several emails about Singh's deposition.  (Doc. 111 at 65, 67)  That same day, Jaburg Wilk noticed Singh's deposition, apparently without having contacted Fiesta's counsel to confirm availability.  (Docs. 81, 84)  On December 13, Fiesta filed an emergency motion for a protective order involving Singh's deposition.  (Doc. 84)  Mr. Kresin filed a Notice of Appearance the following day.  (Doc. 86)  Jaburg Wilk and Mr. Kresin exchanged several emails on December 13 and 14.  On December 14, the Court conducted a

telephonic discovery hearing on Fiesta's motion and Singh's deposition was rescheduled for January 12, 2017. (Docs. 87, 88) On December 20, Jaburg Wilk and Mr. Kresin had a phone call "to discuss emails from Mason concerning ER 4.2 and related issues." (Doc. 111 at 67) On January 9, Jaburg Wilk and Mr. Kresin exchanged several emails about key pleadings and had one phone call about Singh's deposition. (Doc. 111 at 66, 67)

On January 11, Zuniga's counsel disclosed that Jaburg Wilk had paid Mr. Kresin $2,500 to represent Singh. (Doc. 111 at 150) Singh's deposition proceeded on January 12. (Doc. 111 at 106) As relevant here, Singh testified that her daughter and Zuniga were involved in giving her Mr. Kresin's name and number. (Doc. 111 at 115-20) During her deposition, the parties contacted this Court for assistance with discovery disputes and the Court ruled that there was "no attorney-client privilege applicable here." (Doc. 111 at 156)

At the end of her deposition, Singh terminated Mr. Kresin's representation because "[g]iven what the judge had said [about the inapplicability of privileges,] there is no point." (Doc. 111 at 191; Doc. 107) Singh's deposition was continued on January 19, 2017. (Doc. 102) Singh was not represented by any counsel during the continuation of her deposition. (Doc. 111 at 190)

Fiesta has moved for various sanctions relating to Jaburg Wilk's use of Singh's testimony in this case. (Doc. 111) Jaburg Wilk claims it did nothing wrong. (Doc. 114)

Under ER 4.2, all lawyers are prohibited from "*ex parte* contacts with persons whose acts or omissions in connection with the matter may be imputed to the organization." *Lang v. Superior Court, In and For County of Maricopa*, 826 P.2d 1228, 1233 (Ariz. App. 1992). This means that Singh's scope of authority—whether she implemented Williamson's personnel decisions or had the authority to make independent decisions about payroll— is at the heart of the ER 4.2 analysis.

The Court will assume that Jaburg Wilk had concluded that Singh's description of her work as ministerial meant that it could obtain her affidavit for its Response without implicating ER 4.2. In other words, the Court will assume that Jaburg Wilk walked into

this issue unaware that Singh's role could be viewed as an ER 4.2 violation.[8]

Nevertheless, Fiesta immediately disputed this characterization of Singh's role and objected to her involvement in this case. (Doc. 24) On notice of Fiesta's objection and the Court's concern, the case proceeded to discovery where Jaburg Wilk proceeded in a manner that—at best—constitutes the appearance of impropriety.

With full knowledge that opposing counsel would be scrutinizing this issue, Jaburg Wilk initiated the process of obtaining counsel for Singh shortly after the case management conference and kept Mr. Kresin current on the status of the case for months before he appeared in the case to Fiesta's counsel. When he did appear, neither Mr. Kresin nor Jaburg Wilk acknowledged their relationship until, faced with a subpoena, they claimed a common interest privilege. Moreover, at a certain undisclosed point, Jaburg Wilk paid Mr. Kresin $2,500 to represent Singh and kept this unusual arrangement hidden until the 11th hour.

The Court notes that Jaburg Wilk has not defended or explained its conduct during discovery: it has not disclosed any exculpatory emails, proffered any explanatory affidavits from counsel, or suggested any form of *in camera* review to justify its actions. Instead, Jaburg Wilk argues that the opportunity to depose Singh cleanses the taint from her affidavit. (Doc. 114) This argument might have been persuasive if Jaburg Wilk's involvement with Singh had ended after her affidavit was signed. However, a cursory review of a privilege log shows that, after the case management conference, Jaburg Wilk spent months arranging for—and paying for—Singh's new counsel and then claimed privilege with him. Singh, the client who was supposed to be driving the representation, subsequently testified that she was steered toward Mr. Kresin and that the lynchpin of his representation was to maintain confidentiality with Jaburg Wilk.

These actions have placed an irrevocable stain on Singh's involvement in this case and so the Court will grant Fiesta's request to preclude testimony from Singh. Because

---

[8] The Court acknowledges the unusual facts presented here: the same law firm representing, seriatim not concurrently, two sisters who are both former employees of the same company.

- 9 -

her involvement was the cause of Fiesta's concern, the Court concludes that excising her testimony is a proportionate and narrowly tailored response that will remove the appearance of impropriety associated with her presence in this case.

Fiesta has requested other sanctions including an evidentiary hearing to detail these issues and requested several types of sanctions. (Doc. 111) The Court concludes that this matter has been sufficiently developed and additional testimony or sanctions are not necessary. Fiesta has also moved to recover fees related to this portion of discovery. This request will be denied. Discovery often takes unexpected turns and Fiesta's counsel's extensive experience litigating this kind of claim means he should have been able to do so here with the targeted precision of a seasoned litigator.[9]

**IT IS ORDERED** granting in part and denying in part Plaintiff's Motion for Summary Judgement (Doc. 124) and Defendants' Motion for Summary Judgement (Doc. 121), as described herein. The Counter-Complaint shall be dismissed in full. The Court will enter a separate order for pre-trial deadlines on Plaintiff's remaining claims.

**IT IS FURTHER ORDERED** granting Plaintiff's Rule 41(a)(2) Motion to Dismiss David M. Reaves, Chapter 7 Bankruptcy Trustee (Doc. 117). Trustee Reaves shall be dismissed with prejudice as both Plaintiff and Counter-Defendant from this case.

**IT IS FURTHER ORDERED** granting in part and denying in part Defendants' Motion to Disqualify (Doc. 111).

Dated this 29th day of September, 2017.

_____
David K. Duncan
United States Magistrate Judge

---

[9] The Court notes that Fiesta's counsel was also counsel of record in the ER 4.2 cases repeatedly listed in Fiesta's briefing.